# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SHIRLEY HILTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 14 C 6928 |
| | ) | |
| RELIANCE STANDARD LIFE INSURANCE COMPANY, | ) | Judge John Z. Lee |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Shirley Hilton seeks judicial review of Reliance Standard Life Insurance Company's ("Reliance") denial of long term disability benefits, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The parties have cross moved for summary judgment. For the reasons provided herein, the Court grants Reliance's motion and denies Hilton's motion.

## Facts[1]

Hilton worked as a line haul dispatcher for Old Dominion Freight Line until May 16, 2013. Pl.'s LR 56.1(a)(3) Stmt. ¶ 6. As an employee, she participated in Old Dominion's long term disability plan, which is both administered and funded by Reliance. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 1, 3. Hilton stopped working on May 17, 2013, complaining of bloating and diarrhea. *Id.* ¶ 13. The administrative record includes a letter signed by Dr. Richard T. Escajeda, Hilton's family practitioner, that states: "This is to certify that Shirley Hilton has been under our care on 5/17/13 and was unable to work. She may return to work on 12/1/13 with no restrictions." A.R. 299.

---

[1] Unless otherwise noted, the following facts are undisputed.

Hilton submitted a claim for long term disability benefits on July 1, 2013, based upon her symptoms and stated that her projected return-to-work date was December 1, 2013. *Id.* On July 3, 2013, Reliance confirmed receipt of Hilton's claim submission and provided her with its claim handling statement of principles, which outlines the steps taken by Reliance to promote the fair adjudication of claims. A.R. 95–96, 98.

Under the terms of the long term disability plan, a monthly benefit will be paid if the insured "[s]ubmits satisfactory proof of Total Disability." Def.'s LR 56.1(a)(3) ¶ 9. "Total Disability" means that "[d]uring the Elimination Period and for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation." *Id.* ¶ 10. "Regular Occupation," in turn, is defined as "the occupation the Insured is routinely performing when Total Disability begins. We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale." *Id.* ¶ 11. The benefit plan gives Reliance discretionary authority to interpret the terms of the policy and to determine eligibility for benefits. *Id.* ¶ 12 ("Reliance . . . shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits.").

### A. Hilton's Medical Records

Dr. Escajeda provided medical certification in support of Hilton's application on July 1, 2013. *Id.* ¶ 14. He listed Hilton's subjective symptoms as including diarrhea and irritable bowel syndrome, and her objective symptoms as including extreme bloating. *See* A.R. 135. Dr. Escajeda stated that no secondary condition contributed to her disability. *See id.* He further stated that during an eight-hour day, with two breaks and lunch, Hilton was unable to alternately

stand, sit, walk or drive. *Id.* ¶ 15. However, he also stated that she was able to continuously climb, squat, kneel, crawl, drive, lift up to fifty pounds, and frequently carry twenty-five pounds in an eight-hour day. *Id.*

As part of its claims adjudication process, Reliance received and reviewed medical records dated May 19, 2005 through May 29, 2013 from Digestive Health Specialists, as well as the medical records submitted by Hilton. *Id.* ¶¶ 16, 41. Those records showed the following:

In May 2005, Hilton underwent a "significantly negative colonoscopy" despite complaints of abdominal pain, diarrhea, and blood in her stool. *Id.* Two years later, Hilton was treated for possible minimal asymptomatic irritable bowel syndrome. *Id.* ¶ 17. By the fall of 2008, Hilton's diarrhea and bleeding had stopped. *Id.* ¶ 18. In November 2009, Hilton was diagnosed with ulcerative proctitis on the rectum, which resolved itself by March 2011. *Id.* ¶¶ 19, 24.

In February 2010, Hilton underwent gastric bypass surgery, and, during several follow-up visits, reported having diarrhea. *Id.* ¶ 20. In June 2010, after another follow-up visit, her physician, Dr. Gary Poleynard ruled out irritable bowel disease and concluded that Hilton's diarrhea may have many causes, including her altered anatomy. *Id.* ¶¶ 21, 29. A physician's assistant ordered a sigmoidoscopy in January 2011, which revealed hemorrhoids and a few diverticula, but was otherwise normal. *Id.* ¶ 23.

In March 2010, Hilton reported having 6 to 8 bowel movements a day with urgency, but it was noted that her weight was stable and her diet regular. *Id.* ¶ 24. In April 2010, Hilton reported having fewer bowel movements while taking the medication Protonix. *Id.* ¶ 27. A sigmoidoscopy performed in August

2012 showed no abnormalities, and at that time, Hilton's weight was stable. *Id.* ¶¶ 31–32. Hilton's stable weight and normal test results were also noted during her August 30, 2012, office visit. *Id.* ¶ 32.

In April 2013, Hilton complained of experiencing twenty episodes of diarrhea per day, but a subsequent esophagogastroduodenoscopy showed no abnormalities and no evidence of inflammatory bowel disease or colitis. *Id.* That same month, she underwent an abdominal CT that revealed a mild thickening of the distal stomach and proximal duodenum but was otherwise normal. *Id.* ¶ 33.

In May 2013, Dr. Poleynard changed Hilton's medication to see whether it would affect her diarrhea. *Id.* ¶ 34. Hilton did not return to Dr. Poleynard for a follow-up. *Id.* Dr. Poleynard did not provide any restrictions or limitations on Hilton's ability to work. *Id.* ¶ 35.[2]

Hilton also provided Reliance with documentation relating to her claim for social security disability income benefits. *Id.* ¶ 42. The documentation showed that on July 30, 2013, the Social Security Administration notified her that she did not qualify for benefits on her claim, because she was not disabled under Social Security Administration rules. *Id.*

**B.    Hilton's Regular Occupation as Motor Vehicle Dispatcher**

In addition, John J. Zurick, a Senior Rehabilitation Specialist, reviewed Hilton's claim file on Reliance's behalf. *See* Pl.'s LR 56.1(a)(3) Stmt. ¶ 25; A.R. 286–88. Zurick concluded that the position of Motor Vehicle Dispatcher, as listed in the Dictionary of Occupational Titles,

---

[2]    Although Hilton attempts to dispute this factual statement, the facts she provides do not support her denial. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35. Hilton quotes the portion of Dr. Poleynard's notes in which he recounts what Hilton had reported to him. *See id.* But a patient's self-reporting as to how she feels limited by her symptoms is not the same as a doctor's imposing work restrictions on the patient. In addition, Hilton relies on Dr. Poleynard's statement regarding the possible cause of her diarrhea, *see id.*, but this does not contradict the fact that Dr. Poleynard did not believe that work restrictions were necessary.

best represented the vocational, educational, physical, and cognitive requirements of Hilton's Regular Occupation. *See* A.R. 286–88.

        **C.**        **Reliance's Claim Adjudication**

On July 31, 2013, Marianne P. Lubrecht, RN, BSN, performed a clinical review of Plaintiff's records at Reliance's request. Lubrecht noted that although Dr. Poleynard had changed Hilton's medication to alleviate her diarrhea in May 2013, and instructed Hilton to call him two weeks afterwards to report whether the medicine had helped, there was no record of any further treatment from Dr. Poleynard. *Id.* ¶ 57; A.R. 57. Furthermore, Claims Examiner Hector Lara's review of the case in August 2013 did not substantiate Hilton's claim of total disability. *Id.* ¶ 43.

On September 9, 2013, Reliance denied Hilton's claim, explaining:

> According to the medical records reviewed your status post gastric bypass/bowel reconstruction 2010 and where you have a history of ulcerative colitis. You consulted with gastroenterology, Poleynard, at the date of loss reporting uncontrolled diarrhea. Medication was changed and you were to call in 2 weeks. Per Medical Review Department call to Dr. Poleynard's office, the record from 5/16/13 is the last record. Colonoscopy 4/13 was normal without evidence of inflammatory bowel disease or colitis. PCP [("Primary Care Physician")] note of 5/13 reflects that you will discuss disability with appointment with Duke to be made for 11/13 and note of 7/13 documenting completion of FMLA form and diagnoses of heartburn/dysuria. Records do not support ongoing impairment. PCP note of 7/1/13 does not mention diarrhea suggesting 5/16/13 medication change controlled problem. Lack of work function is supported date of loss through 8/15/13 only.

*Id.* ¶ 44.

        **D.**        **Hilton Appeals the Determination**

Hilton appealed the denial. *Id.* ¶ 45. In support of her appeal, she submitted her own handwritten letter, dated October 31, 2013, stating that she had ulcerative colitis and experienced

5

ten to fifteen bowel movements a day.  *Id.*  She included with her letter medical records from Dr. Poleynard.

In response to the appeal, Reliance obtained additional medical records from Dr. Poleynard on November 13, 2013.  *Id.* ¶ 46.  The records confirmed that, although Dr. Poleynard had instructed Hilton on May 16, 2013, to call him two weeks after he had changed her medication so that he could determine whether the new medication had alleviated her diarrhea condition, she did not do so and sought no further treatment from him after May 16, 2013.  *Id.*

Reliance also acquired additional medical records from the Duke University Gastroenterology Clinic that included a MRI of Hilton's abdomen and pelvis that showed no abnormality.  *Id.* ¶ 47.  Dr. Joanne A. P. Wilson, who worked at the clinic, noted on November 15, 2013, that Hilton had a history of "dietary indiscretion, high fat;" Plaintiff reported poor adherence to her diet; and her diet prior to her appointment was a "gravy biscuit for breakfast, ham sandwich for lunch, fried chicken tenders and French fries for dinner."  *Id.* ¶ 48.  Dr. Wilson further noted that Hilton had anxiety and depression, which "may contribute significantly to her symptoms."  *Id.*  Dr. Wilson recommended that she take two tablets of Imodium before meals and at bedtime and one tablet of Colestid twice per day, avoid fatty foods and caffeine, and resume her post bypass solid diet.  *Id.* ¶ 49.  Hilton's blood tests did not indicate that she suffered from malnutrition, abnormal vitamin B12 levels, or anemia.  *Id.* ¶ 50.

In addition, Reliant hired a gastroenterologist at the MES Group, Inc., which provides independent medical record evaluations, to review Hilton's disability claim.  *Id.* ¶ 52.  Dr. Steven Tawil, who is board certified in internal medicine and gastroenterology and a physician at Methodist Hospital in Brooklyn, New York, reviewed Hilton's records.  *Id.* ¶ 53.  Dr. Tawil remarked that, after undergoing gastric bypass surgery, Hilton initially lost over 100 pounds, but

then she slowly and steadily gained weight. *Id.* ¶ 54. According to Dr. Tawil, Plaintiff's "progressive weight gain despite complaint of multiples stools, the lack of azotemia, dehydration, or electrolyte disturbance, the consistently normal CBC and basic metabolic panel, the normal urine analysis on 11/14/13, as well as the normal MRI of the abdomen and pelvis on 11/27/13, the normal EGD and colonoscopy on 4/15/13, the normal biopsies of the colon on 4/15/13, the normal CT of the abdomen on 4/24/13, the normal abdominal sonograms, and normal small bowel series in the past, all support the absence of any impairment in this case." *Id.* ¶ 57.

He also observed:

> Despite complaints of incontinence, there has been no documented need for diapers, or perianal dermatitis. Despite a single stool for pancreatic elastase that was depressed, raising concern for malabsorption, the claimant's complaints did not improve with pancreatic enzymes. All the other data does not support a significant malabsorption condition. The weight has been rising, the albumin is normal, B12 and vitamin D levels are normal, and complete blood count (CBC) is consistently normal. Imaging data has not shown a chronic pancreatitis picture. The physician's statement of bleeding is not substantiated by any of the progress notes where bleeding is consistently denied.

*Id.* ¶ 55. Dr. Tawil explained that Hilton's "antidiarrheal therapy has [not] been exhausted" and "that it was conceivable that with proper use of antidiarrheal agents, the stool complaints [could] be brought under control, with a resumption of full work activity." *Id.* ¶ 56. Dr. Tawil additionally stated that the records did not identify any restrictions or limitations that would prevent Hilton from performing her occupation on or after May 17, 2013; none of the multiple progress notes submitted for review indicated any physical restriction or limitation; and Hilton's physical exams were consistently normal. *Id.* ¶ 58.

7

For her part, Plaintiff provided Reliance with a note from Dr. Escajeda on February 2014,. The note, in its entirety, stated: "This is to certify that Shirley Hilton has been under my care on 1-31-2014. She needs to continue to be out of work indefinitely due to colitis." *Id.* ¶ 51.

Based on a review of Hilton's medical records, Reliance upheld its previous denial of her claim on April 3, 2014. *Id.* ¶ 59. Reliance's appeals specialist Nuri Noaz explained that the medical records indicated normal diagnostic tests and lab results, as summarized by Dr. Tawil. *Id.* Reliance also noted that, to the extent that a single medical treatment record indicated that anxiety and depression could have been contributing to Hilton's physical condition, she was not entitled to benefits because her records indicated that she had not been under the regular care of her physician or any mental health provider for anxiety or depression. *Id.*

On September 8, 2014, Hilton filed this lawsuit seeking review of Reliance's denial of benefits. She requests a declaration that Reliance is obligated to pay her past due benefits, as well as attorneys' fees and costs.

**Legal Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross motions for summary judgment, a court views the record in the light most favorable to the losing party and draws all reasonable inferences in that party's favor. *Jones v. C&D Techs., Inc.*, 684 F.3d 673, 676 (7th Cir. 2012).

In an ERISA action, where the benefit plan gives discretionary authority to the plan administrator to determine an individual's eligibility for benefits, a denial of benefits is reviewed under the arbitrary and capricious standard. *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 377 (2002). "Under the arbitrary and capricious standard, we will uphold an administrator's

determination unless it is downright unreasonable," and "so long as it is possible to offer a reasoned explanation, based on the evidence, plan documents, and relevant factors that encompass the important aspects of the problem." *Fischer v. Liberty Life Assur. Co. of Boston*, 576 F.3d 369, 376 (7th Cir. 2009) (quotation omitted). "[W]hen determining whether a decision to [deny] benefits was arbitrary and capricious, we look to whether specific reasons for denial [were] communicated to the claimant, whether the claimant [was] afforded an opportunity for full and fair review by the administrator, and whether there is an absence of reasoning to support the plan's determination." *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009) (quotations omitted).

Furthermore, where, as here, a benefits plan vests such discretionary authority in an administrator who is responsible for both evaluating claims *and* paying the benefits, the potential of a conflict of interest "must be weighed as a 'factor in determining whether there is an abuse of discretion.'"[3] *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). As the Seventh Circuit noted in *Marrs v. Motorola, Inc.*, however, "a conflict of interest . . . is a given in almost all ERISA cases." 577 F.3d 783, 789 (7th Cir. 2009). "It is thus not the existence of a conflict of interest . . . but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Id.* "[A] conflict may carry more weight when the 'circumstances suggest a higher likelihood that it affected the benefits decision,' as when an insurer has a history of biased claims administration." *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 700 F.3d 1076, 1082 (7th Cir. 2012) (quoting *Glenn*, 554 U.S. at 117). "At the same time, the conflict would carry less weight when the insurer took active steps

---

[3] While some courts refer to the deferential standard of review under ERISA as an "abuse of discretion standard," the Seventh Circuit describes it as an "arbitrary and capricious standard." *See Hawkins v. First Union Corp.*, 326 F.3d 914, 916 (7th Cir. 2003). However, "this appears to be a distinction without a difference." *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 815 n.4 (7th Cir. 2002).

to reduce potential bias and to promote accuracy." *Id.* In addition, other circumstances relevant to determining whether a conflict affected a benefits decision include "the reasonableness of the procedures by which the plan administrator decided the claim" and "any safeguards the plan administrator has erected to minimize the conflict of interest." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009).

## Discussion

Hilton argues that Reliance's denial of her claim was arbitrary and capricious because: (1) John Zurick failed to consider her non-exertional limitations when determining that she is capable of performing the material duties of her regular occupation; (2) Reliance did not have its own physician examine her and did not call her treating physicians to discuss her treatment plans; and (3) Dr. Tawil selectively ignored restrictions placed on her by her treating physicians. Reliance counters that (1) Zurick's only role was to determine the occupational title that most closely matched Hilton's job description; (2) Reliance was not required to conduct an independent examination of Hilton and, in any event, obtained complete and updated medical records during the adjudicatory process which made calling Hilton's treating physicians unnecessary; and (3) no objective evidence supported the restrictions by Hilton's treating physicians that prohibited her from working full-time as a Motor Vehicle Dispatcher.

### I. John Zurick's Role in the Claims Process

Hilton asserts that Senior Rehabilitation Specialist John Zurick provided a "fatally flawed vocational analysis that fail[ed] to consider any non-exertional limitations" with regard to her "residual functional capacity or ability to work on a full-time basis." Pl.'s Br. Supp. Mot. Summ. J. 5; Pl.'s LR 56.1(a)(3) Stmt. ¶ 25 (citing A.R. 286–88); Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 40.

10

According to Reliance, Hilton is mistaken as to the role Zurick played during the claim process. The record supports this conclusion.

As indicated in the administrative record, Zurick's involvement was limited to determining that the position of Motor Vehicle Dispatcher, as it is defined in the Dictionary of Occupational Titles, best represented the vocational, educational, physical, and cognitive requirements of Hilton's job. A.R. 286–88. Zurick provided no opinion as to Hilton's residual functional capacity or ability to work. A.R. 288. Thus, Hilton's assignment of error to Zurick is misplaced and provides no basis for concluding that the denial of benefits was arbitrary and capricious.

## II. Reliance's Failure to Examine Hilton or Call Hilton's Treating Physicians

Hilton also argues that, under the terms of the health plan, Reliance had a right to hire its own physician to examine her, *see* A.R. 14, and Reliance's failure to do so is evidence that its denial was baseless. But the fact that Reliance had a right to have its own physician examine Hilton does not mean it was obligated to do so or that its denial was unreasonable. Moreover, the Seventh Circuit has rejected the argument that a denial of benefits after a medical file review was arbitrary and capricious in the absence of a physical examination. *See Leger*, 557 F.3d at 832; *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006).

Next, Hilton takes issue with the fact that Reliance did not call her treating physicians to discuss her treatment plan. But Reliance collected all of the medical records from Hilton's treating physicians prior to its initial denial of her claim and later obtained updated medical records after she appealed. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 16–38, 46–51. Nowhere does Hilton explain what additional information Reliance could have been obtained by calling her treating physicians not already in the record.

## III. Dr. Tawil

Lastly, Hilton argues that Dr. Tawil, a gastroenterologist who independently reviewed Hilton's medical records, failed to offer a reasoned explanation as to why she did not qualify for long term disability benefits. Specifically, Hilton states that Dr. Tawil selectively ignored restrictions placed on her by her treating physicians. To support this argument, Hilton primarily relies upon portions of the medical records where her treating physicians merely recount what she herself had reported to them about her diarrhea condition. *See, e.g.*, A.R. 156, 160, 203, 207, 217, 221, 233, 236, 333. As discussed above, Hilton's self-reported symptoms are not synonymous with physician-imposed restrictions. Hilton also cites Dr. Escajeda's diagnoses of chronic diarrhea, irritable bowel syndrome, and colitis, A.R. 250, as well as his letters stating that she should have been off work from May 17, 2013, through December 1, 2013, and indefinitely going forward, A.R. 299, 511. On this point, *Ruiz v. Continental Casualty Co.*, 400 F.3d 986, 987 (7th Cir. 2005), is informative.

In *Ruiz*, one of the treating physicians based his assessment of the plaintiff's capabilities on the plaintiff's complaints. The district court, nevertheless, granted summary judgment in favor of the plan administrator, and the Seventh Circuit affirmed. *Id.* The court held that the administrator's denial of benefits was not arbitrary and capricious because "the primary evidence supporting Ruiz's claim . . . was his own subjective complaints of pain" and there was a "lack of objective medical evidence supporting Ruiz's claim that he can perform no work he is trained to do." *Id.* at 992.

As in *Ruiz*, Hilton primarily relies on her own subjective complaints of the frequency of her diarrhea to establish that she is unable to perform the material duties of a motor vehicle dispatcher. Furthermore, Dr. Escajeda's assessment that irritable bowel syndrome and colitis

preclude her from working is unsupported by the objective medical evidence in the record. A.R. 121–22. Indeed, Reliance's appeal specialist, Nuri Noaz, and Dr. Tawil explained that, according to Hilton's medical files, other than her intermittent bouts of colitis, high cholesterol, hemorrhoids, and one instance of a decrease in stool pancreatic elastase and ferritin levels, her colonoscopy results have been unremarkable, the biopsies and stool cultures were negative, her blood lab results were normal, and her weight was stable and, in fact, increasing.[4] A.R. 120–21. Dr. Tawil also concluded that, "[a]lthough there is a complaint of multiple loose stools per day, there has been no documented electrolyte disturbances, azotemia, weight loss, dehydration, need for intravenous fluid therapy, emergency room visits, or hospitalizations." Def.'s LR 56.1(a)(3) ¶ 55; A.R. 521.

It does not help Hilton's case that she never sought further treatment from Dr. Poleynard for her diarrhea, despite his recommendation that she do so if the symptoms continued. A.R. 100, 120; *see* A.R. 148. Nor does it aid her that, even though she had been instructed to avoid fatty foods to prevent further diarrhea, she admitted to her gastroenterologist Dr. Joanne Wilson that she had eaten biscuits and gravy for breakfast, a ham sandwich for lunch, and fried chicken tenders and french fries for dinner prior to her appointment in November 2013. A.R. 121.

The Court must be mindful that its "task here is not to determine if the administrator's decision is correct, but only if it is reasonable." *Davis*, 444 F.3d at 576–77. Given the paucity of objective medical evidence to support Hilton's claim that, due to a medical condition, she cannot perform the material duties of her occupation, the Court concludes that Reliance's denial of her claim was not arbitrary and capricious. Moreover, Hilton has not presented any facts that would

---

[4] Although Hilton argues that Reliance's statement that she gained weight is false, *see* Pl.'s Reply Br. 4–5, the record supports Reliance's statement. *Compare* A.R. 186 (160 lbs. on May 16, 2013), *with* A.R. 471 (172 lbs. on November 14, 2013).

suggest that Reliance's conflict of interest affected its decision in any material manner.[5] Nor is this a close case where an inherent conflict of interest could act as a tie-breaking factor.[6]

### Conclusion

For the reasons provided in this Memorandum Opinion and Order, the Court denies Hilton's summary judgment motion [42] and grants Reliance's cross motion [45]. This case is hereby terminated.

**SO ORDERED**　　　　　　　　　　　　**ENTERED  3/1/16**

*[signature: John Z. Lee]*
_____
**John Z. Lee**
**United States District Judge**

---

[5] Although Hilton states that Reliance paid Dr. Tawil directly for his medical file review services, *see* Pl.'s LR 56.1(a)(3) Stmt. ¶ 22, that statement is unsupported by the cited portion of the record, A.R. 522. Reliance counters that MES, not Reliance, paid Dr. Tawil for his services. Def.'s LR 56.1(b)(3)(B) Stmt. ¶ 22. Even if Hilton's fact statement were supported by the record, and even if the Court were to view this disputed fact in Hilton's favor, this is not the type of borderline case in which this fact might hypothetically tip the scale in Hilton's favor.

[6] While her lawsuit was pending, Hilton's renewed claim for social security disability income benefits was granted on October 23, 2015. *See* Pl.'s Opposed Mot. Leave Supplement Administrative Record at 5 [ECF 55]. As conceded by Hilton, the only way in which the Social Security Administration's decision would impact this litigation is if the Court were to remand the case to the plan administrator for further adjudication. *See id.* at 1–2. Given that the Court grants summary judgment in Reliance's favor, the point is moot.